FILED
United States Court of Appeals
Tenth Circuit

October 27, 2023

Christopher M. Wolpert
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

CHRISTINA TERRY, individually and on behalf of her minor child, G.T., and on behalf of all others similarly situated,

    Plaintiff - Appellant,

v.

HEALTH CARE SERVICE CORPORATION, a mutual legal reserve company, d/b/a Blue Cross and Blue Shield of Oklahoma,

    Defendant - Appellee.

No. 21-6141
(D.C. No. 5:18-CV-00415-PRW)
(W.D. Okla.)

_____

### ORDER AND JUDGMENT[*]

_____

Before **EID**, **BALDOCK**, and **CARSON**, Circuit Judges.
_____

    A "preferred provider organization" or PPO health insurance plan consists of "networks" made up of healthcare practitioners, facilities, and affiliates who contract with health insurance companies such as Blue Cross and Blue Shield of Oklahoma (BCBSOK) to provide its insureds medical services. Known as "preferred providers," these practitioners, facilities, and affiliates offer healthcare services to PPO policyholders at reduced rates. Preferred providers accept a previously negotiated

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

price from the insurer as payment for covered services. The insured is not responsible for the difference if a preferred provider bills more than the allowable charge. Consistent therewith, the BCBSOK PPO policy before us today informs the insured that "[t]o take full advantage of the negotiated pricing arrangements in effect between [BCBSOK] and our [n]etwork [p]roviders, it is imperative that you use [n]etwork [p]roviders in Oklahoma[.]" App'x Vol. I, at 59.

Contrast this with the allowable charge for an out-of-network or non-contracting provider. The subject policy says that in such case the allowable charge will be the lesser of (1) the service provider's billed charges, or (2) the insurance plan's non-contracting allowable charge as determined by a method set forth in the policy. *Id*. The policy further informs the insured that where the policy's allowable charge for a non-contracting provider is less than such provider's billed charges, the insured is responsible for the difference. *Id*. at 60. And according to the policy, "[t]his difference may be considerable." *Id*.[1]

\* \* \*

The difference was considerable for Plaintiff Christina Terry. On January 1, 2014, Defendant BCBSOK became Plaintiff's health insurance provider. Two weeks after Plaintiff procured her PPO health insurance policy, Plaintiff's son, G.T., was

---

[1] We are well aware that an insured under a PPO policy does not always have the option of selecting a preferred provider to provide healthcare services, especially where an emergency situation arises and time is of the essence. The availability of preferred providers nearby, of course, is a consideration in deciding whether to purchase a PPO policy or choose another healthcare insurance option.

2

prematurely born with underdeveloped lungs in Elk City, Oklahoma. Due to G.T.'s precarious condition, his doctor recommended G.T. be transported via air ambulance to the University of Oklahoma's Children's Hospital in Oklahoma City. Rocky Mountain Holdings (RMH) transported G.T. and billed charges of $49,999.00 for the 109-mile trip. RMH submitted a claim to BCBSOK for 100% of its charges. But RMH was a non-contracting provider.

On May 29, 2014, BCBSOK provided Plaintiff with an "Explanation of Benefits" (EOB). *See* App'x Vol. I, at 152–55. The first EOB described the service Plaintiff's son received as "Air Ambulance" and, contrary to Plaintiff's characterization, indicated none of RMH's charges were covered. While the EOB told Plaintiff that her claim was denied, it further stated that BCBSOK had requested additional information from RMH and her claim would be processed again once the information was received. BCBSOK issued Plaintiff a second EOB on September 4, 2014. *Id.* at 156–59. Again describing RMH's service as "Air Ambulance," the second EOB indicated the amount RMH had billed was $49,999.00. BCBSOK covered only $4,849.86 of the total bill. The EOB listed the amount not covered as $45,149.14 and indicated Plaintiff may owe this amount to RMH. Under the heading "Information About the Amounts Not Covered," the EOB stated: "The billed amount is greater than the allowed amount for this service. Since an out-of-network provider performed the services, you are responsible for additional charges. No payment can be made above the allowed amount." *Id.* at 156.

3

After Plaintiff's now ex-husband phoned BCBSOK and verbally objected to its coverage determination, BCBSOK issued Plaintiff a third EOB on October 7, 2014.[2] *See id.* at 160–63. The third EOB adjusted the benefits approved to total $4,849.86, the amount the second and third EOBs stated was covered under Plaintiff's BCBS policy. This resulted in an additional payment to Plaintiff of $1,939.94 so that the total benefits paid to Plaintiff amounted to $4,849.86. The third EOB reiterated what the second EOB had stated about the amount not covered under the policy—$45,149.14—and told Plaintiff she was responsible for such amount. Plaintiff stopped paying her policy premiums after October 2014, the same month she received the third EOB.

On December 14, 2014, following issuance of the third EOB, Plaintiff inexplicably bypassed the internal review procedures set forth in both the policy and all three EOBs, and instead filed a "Request for Assistance" with the Oklahoma Insurance Department (OID). Notably, Plaintiff's BCBSOK policy provided for OID's external review of a final adverse benefits determination only "if [BCBSOK's] decision involved making a judgment as to the Medical Necessity, appropriateness, healthcare setting, level of care or effectiveness of the health care service or treatment." *Id.* at 115 (emphasis omitted). At OID's request, BCBSOK provided OID information regarding Plaintiff's claim on December 31, 2014. OID took no action against BCBSOK.

---

[2] Plaintiff Christina Terry's ex-husband, Jeffrey Terry, was also a named Plaintiff in the district court. He voluntarily dismissed his claims against BCBSOK in May 2019.

I.

Plaintiff filed this putative class action against BCBSOK on April 27, 2018, alleging breach of contract, bad faith, and fraud. She invoked the district court's diversity jurisdiction by way of her putative class action. *See* 28 U.S.C. § 1331(d)(2). Plaintiff sought reimbursement of RMH's invoiced amount as well as five million dollars on behalf of the putative class. The district court stayed class discovery but permitted discovery to proceed as to Plaintiff's individual claims. Following discovery, BCBSOK moved for summary judgment. *See* Fed. R. Civ. P. 56. Apart from the merits, BCBS argued the applicable limitations periods—three years on the breach of contract claim pursuant to the terms of the policy and two years on the bad faith and fraud claims pursuant to Okla. Stat. tit. 12, § 95(A)(3)—barred Plaintiff's action.[3] The court granted BCBSOK's motion and entered judgment in its favor.

The district court first held Plaintiff's bad faith and fraud claims accrued no later than February 2016 and were barred by the two-year limitations period. While the court noted that some facts addressing how Plaintiff's claim was processed, how BCBSOK informed Plaintiff of its adverse determination, and whether Plaintiff had appealed that determination consistent with the terms of the policy were disputed, the court found one fact dispositive. During discovery, BCBSOK asked Plaintiff via

---

[3] Oklahoma law provides "[n]o policy delivered or issued in Oklahoma and covering a subject of insurance resident, located, or to be performed in Oklahoma, shall contain any condition, stipulation or agreement. . . limiting the time which an action may be brought to a period of less than two (2) years from the time the cause of action accrues[.]" Okla. Stat. tit. 36, § 3617.

5

written, sworn interrogatories to "[i]dentify and describe the circumstances surrounding each action you took to 'request a review' of [BCBSOK's] decision or determination on the [c]laim[.]" App'x Vol. II, at 242. Plaintiff responded in relevant part as follows:

> Plaintiff Jeff Terry contacted BCBSOK by phone after the OID inquiry was complete to see if BCBSOK was going to take any additional actions in response to the OID matter, but he did not hear back substantively from BCBSOK. Plaintiffs did not know what to think about the failure of BCBSOK to get back to them, but *on[c]e [RMH's] garnishment proceeding [against Plaintiff Cristina Terry] was filed in February 2016, Plaintiffs realized that BCBSOK was not going to take care of them*.

*Id.* at 243 (emphasis added). On top of Plaintiff's admission that she knew by February 2016 that BCBSOK was not going to satisfy her insurance claim, the district court pointed out, among other things, that Plaintiff's consumer complaint directly to OID was not an appeal of BCBSOK's benefits denial pursuant to any policy provision, and "thus changes nothing with respect to the finality of its denial of the claim." *Terry v. Health Care Serv. Corp.*, 2021 WL 4449997, at *2 (W.D. Okla. 2021).

The district court next held the policy's limitations provision (which we discuss in more detail subsequently) barred Plaintiff's breach of contract claim. The court rejected Plaintiff's argument that the limitations provision was ambiguous and confusing and therefore unenforceable under the Oklahoma doctrine of reasonable expectations. The court observed that the limitations provision "plainly and unambiguously" states no legal action is available "'later than three years after expiration of the time within which a Properly Filed Claim is required by this Contract.'" *Id.* at *3. The court then referenced another provision explaining when a

6

properly filed claim is required. According to the district court, "[t]here is nothing inherently ambiguous about any of this." *Id.*

## II.

Plaintiff appeals the final decision of the district court pursuant to 28 U.S.C. § 1291. Our review from a district court's grant of summary judgment is de novo. *See Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1140 (10th Cir. 2023). Addressing her breach of contract claim first, Plaintiff invokes the doctrine of reasonable expectations as recognized in *Max True Plastering Co. v. U.S. Fid. & Guar.*, 912 P.2d 861 (Okla. 1996). The doctrine allows courts to consider the reasonable expectations of the parties in construing an insurance contract. The doctrine applies only to the construction of "ambiguous contract language or to exclusions which are masked by technical or obscure language or which are hidden in a policy's provisions." *Id.* at 870. Because the policy language provides the best indication of the parties' reasonable expectations, "courts must examine the policy language *objectively* to determine whether an insured could reasonably have expected coverage." *Id.* at 865 (emphasis added). As we explained in *Salisbury v. Hartford Life and Accident Co.*, 583 F.3d 1245, 1248 (10th Cir. 2009): "In order to determine whether a[n] [insurance policy] is ambiguous [or confusing], we consider the common and ordinary meaning as a reasonable person in the position of the [insured], not the actual [insured], would have understood the words to mean." Courts undertake this examination as a matter of law. *Max True Plastering*, 912 P.2d at 869.

7

According to Plaintiff, the portions of her BCBS PPO insurance policy addressing the limitations period are "masked with legalese, require[] cross-referencing throughout the policy, [are] hidden, obscure, and [are] not the type of simple, concise, straight forward provision[s] that [are] even potentially enforceable." Aplt's Op. Br. at 6. We disagree. In considering the policy, we accept Plaintiff's representation that "the policy comprised: a PPO policy, an Outline of Coverage, a Schedule of Benefits, and a Summary of Benefits and Coverage[.]" *Id.* at 2. Under the heading "General Provisions," the PPO policy's "Table of Contents" refers the insured to its "Limitations of Actions" provision. The provision states in relevant part:

> No legal action may be taken to recover Benefits . . . later than three years after the expiration of the time within which a Properly Filed Claim is required by the Contract. In addition, the Subscriber must exhaust his/her appeal rights, as set forth in the '***Complaint/Appeal Procedure***' section of this Contract, before pursuing other legal remedies.

App'x Vol. I, at 99 (emphasis in original). The same table of contents refers the insured to a provision entitled "Notice and Properly Filed Claim." This provision states "[y]our Properly Filed Claim must be furnished to the Plan within 90 days after the end of [the] Benefit Period for which the claim is made." *Id.* at 97. In the "Definitions" portion of the policy, "Benefit Period" is defined as "[t]he period of time during which you receive Covered Services for which the Plan will provide benefits." *Id.* at 118. On the first page of the policy's "Outline of Coverage," the "Benefit Period," also referred to as the "Policy Year," is described as the "Calendar Year." *Id.* at 140.

A *reasonable* insured, who by definition has performed due diligence, could readily ascertain from the foregoing language that Plaintiff filed her breach of contract

8

claim later than three years after the expiration of the time within which her policy required her to file an insurance claim. To be sure, the policy language requires cross-referencing, but this is not unusual for a contract—a legal document by definition. So long as "a reasonable person in the position of the [insured], not the actual [insured]," would have understood the policy's terms, then the policy is neither ambiguous nor confusing and the doctrine of reasonable expectations has no application. *Salisbury*, 583 F.3d at 1248. Applying Oklahoma law, we conclude the policy's language is neither ambiguous nor confusing. RMH provided an ambulance service to Plaintiff's newborn son in January 2014.[4] The "Benefit Period" was the calendar year 2014 and ended, at the latest, on December 31, 2014.[5] Plaintiff's properly filed insurance claim was due 90 days later, or at the end of March 2015. Thus, pursuant to the terms of the policy, the limitations period on Plaintiff's contract claim expired at the end of March 2018. Plaintiff's contract claim, filed in April 2018, comes too late.

Running throughout Plaintiff's briefs is the proposition that the three-year limitations period on her breach of contract claim never ran because, up until very shortly before she filed suit in April 2018, Plaintiff was exhausting her internal remedies with BCBSOK. This, of course, presumes, the process of exhausting internal

---

[4] All Plaintiff's verbiage about whether her son received an "ambulance service" or "emergency service" under the policy's terms bears on the merits of her claim rather than on the timeliness of her lawsuit.

[5] Plaintiff discontinued her premium payments to BCBSOK in October 2014 after she received the third EOB. Therefore, we would be quite justified in concluding on the record before us that the Benefit Period ended at that point, making the filing of her contract claim even more tardy.

remedies provided for in the policy tolls the running of its limitations period without stating so. But even accepting Plaintiff's presumption, her verbal "appeals" and "attorney letters" to BCBSOK or OID most assuredly do not comply with the policy's terms outlining the internal appeals process. *See* App'x Vol. 1, at 110–16.

The "Complaint/Appeal Procedure" section of the policy under the bolded heading "How to Appeal an Adverse Benefits Determination," outlines the procedure an insured is to follow in pursuing her internal remedies. *Id.* at 114. The policy states that while BCBS "will honor telephone requests for information[,]" "such inquiries will *not* constitute a request for review" of an adverse benefits determination. *Id.* (emphasis added). Rather, a request for review must be made in writing to BCBSOK's "Appeal Coordinator – Customer Service Department" at a listed address in Tulsa, Oklahoma. *Id.* Nowhere in her briefs has Plaintiff suggested to us she adhered to this procedure. Plaintiff never expressly acknowledges that she did not follow the policy's instructions—also set forth in the three EOBs she received—on how to properly engage the internal review process with BCBSOK. But Plaintiff implicitly acknowledges as much in her Complaint. The factual admission Plaintiff makes in Paragraph 24 of her Complaint well illustrates the difficulty Plaintiff made of this process and consequently this case: "*It is unclear exactly which of Plaintiff's many communications with BCBSOK it treated as an appeal, but Plaintiffs and their representatives had multiple communications with BCBSOK over the years since receiving the emergency services at issue.*" *Id.* at 25–26 (emphasis added).

10

Needless to say, "multiple communications" do not constitute internal appeals under the policy's terms. If such communications tolled the policy's limitation period, one could indefinitely delay its running. An insured wishing to avail herself of an insurance policy's benefits, surely must comply, or at least substantially comply, with the policy's terms, most notably here the internal review process outlined in the policy. Indeed, as we have seen, the policy plainly tells the insured that she must exhaust her appeal rights in writing "*as set forth in the '**Complaint/Appeal Procedure**' section of this Contract*[.]" App'x Vol. I, at 99 (italics added). Because Plaintiff failed to pursue her available internal remedies with BCBSOK consistent with the clear terms of her policy, we have no occasion to consider here whether an insured's proper pursuit of such remedies tolls the policy's three-year limitations period. Plaintiff's "multiple communications with BCBS over the years" certainly have made the facts of this case especially difficult to sort out. But those communications do not save Plaintiff's tardy contract claim.[6]

### III.

Next we turn to Plaintiff's claims that BCBSOK acted fraudulently and in bad faith in failing to cover her insurance claim. Oklahoma law requires us to apply the "discovery rule" to determine when the applicable two-year limitations period begins to run. *See Smith v. Baptist Found.*, 50 P.3d 1132, 1137 (Okla. 2002). The limitations

---

[6] A numbered, chronological recitation of the correspondence, verbal and written, between the parties would have helped greatly. So too would have a substantial reduction in the size of Plaintiff's eight volume Appendix, much of which is repetitive of the facts and irrelevant to the legal issues before us.

11

period begins to run at the point when the plaintiff knew or should have known of an injury, *and*, through prudent investigation, could obtain sufficient facts to state a cause of action. *Erikson v. Farmers Group, Inc.*, 151 F. App'x. 672, 676 (10th Cir. 2005) (unpublished). Importantly, a plaintiff is charged with having knowledge of those facts which were discoverable in the exercise of due diligence. *Id.* (citing *Daugherty v. Farmers Coop. Ass'n*, 689 P.2d 947, 951 (Okla. 1984)). In other words, the limitations period does not cease to run simply because a plaintiff negligently refrains from pursuing inquiries plainly suggested by the facts. The discovery rule encompasses the precept "that acquisition of sufficient information which, if pursued, would lead to the true condition of things will be held as sufficient knowledge to start the running of the statute of limitations." *Delashaw v. Tyson Foods, Inc.*, 100 F. App'x. 762, 766 (10th Cir. 2004) (unpublished) (quoting *Daugherty*, 689 P.2d at 950–51).

Here the record reveals that Plaintiff was aware, or certainly should have been aware, of an injury—that is, BCBSOK would not meet her demands—at the time RMH, the emergency air service responsible for transporting her infant, had a garnishment order issued against her in February 2016. This is what Plaintiff effectively admitted in her sworn interrogatory response previously discussed. *See supra* at 5–6. At the point of RMH's garnishment, Plaintiff understood BCBSOK was "not going to take care of [her]." App'x Vol. II, at 243. Having established Plaintiff's knowledge of an injury, the next inquiry is at what point could Plaintiff have become aware of facts establishing her causes of action for fraud and bad faith.

12

A.

Let us consider Plaintiff's fraud claim first. In order to discern the relevant facts bearing upon the timeliness of Plaintiff's fraud claim, we must first identify the elements of the cause of action. The elements of a fraud claim in Oklahoma are a (1) false material misrepresentation, (2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, (3) with the intention that it be acted upon, and (4) which is relied upon by the other party to her own detriment. *Bowman v. Presley*, 212 P.3d 1210, 1217–18 (Okla. 2009). Oddly enough, Plaintiff never identifies these elements. Needless to say, Plaintiff also never tells us what elements of her cause of action were not discoverable prior to her admission of injury in February 2016.

In distinguishing her fraud claim from her breach of contract claim, Plaintiff tells us that Plaintiff's "fraud arguments are different in that [Plaintiff] is not contending [BCBSOK's] failure to adhere to the contract terms constitutes fraud; *rather [BCBSOK] made representations to [Plaintiff] which she relied upon **when entering the contract***." Aplt's Reply Br. at 9 (emphasis added). These alleged representations include statements by unidentified BCBSOK representatives that Plaintiff's PPO policy was compliant with the Affordable Care Act and that the out-of-pocket limit for out-of-network services was capped. *See id.* at 8. Plaintiff also complains that BCBSOK failed to disclose its position that an air ambulance service is not an emergency care service covered under the policy's terms. *Id.*

13

All this, of course, spells the death knell of Plaintiff's fraud claim. Once Plaintiff acknowledged that she understood no later than February 2016 that BSBSOK was not going satisfy her claim, prudent investigation would have revealed the alleged misrepresentations about which she complains because "she relied upon [them] when entering the contract." Plaintiff's awareness that she had suffered an injury no later than February 2016 was sufficient to permit an investigation into the cause of her injury and uncover BCBSOK's alleged misrepresentations which occurred at or near the time she procured her BCBS PPO policy. Plaintiff possessed sufficient information to permit her to pursue her fraud claim no later than February 2016, the point at which the two-year limitations period began to run. Like her contract claim, Plaintiff's fraud claim comes too late.

B.

All that remains is Plaintiff's bad faith claim, or, in other words, her claim that BCBSOK breached the implied duty to deal fairly and in good faith with its insured. This third claim fares no better than the previous two. The elements of such claim, again unidentified by Plaintiff, are "(1) the claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury." *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 724 (Okla. 2009).

Plaintiff was or should have been aware after she received BCBSOK's third EOB in December 2014—following her now ex-husband's "verbal appeal" to

BCBSOK—that BCBSOK was going to reimburse her in an amount substantially less than she claimed. One only had to read the EOB to understand this. Plaintiff's subsequent "Request for Assistance" to OID strongly suggests she knew as much. But as we have explained, Plaintiff certainly was cognizant that BCBSOK was not going to fulfill her demands by the time RMH commenced garnishment proceedings against her in February 2016.

The crux of a claim for bad faith in the settlement of an insurance claim is the language of the policy itself. Plaintiff must establish that she was entitled to coverage and BCBSOK had no reasonable basis for delaying payment. Plaintiff admits as much in her Complaint: "BCBSOK's refusal to provide such coverage is a breach of its legal obligation owed to Plaintiffs requiring BCBSOK to deal fairly and in good faith with Plaintiffs." App'x Vol. I, at 37. Because Plaintiff's claim rests in large part on the terms of her PPO policy, once she realized her injury, nothing prohibited her *at that point* from pursuing her bad faith claim based upon the wording of the policy and BSBSOK alleged representations regarding coverage, both of which she says entitle her to relief.

Plaintiff argues that BCBSOK was exercising bad faith throughout her ordeal and did not stop until just before she filed suit in April 2018.[7] But we have explained

---

[7] Absent any pertinent authority, Plaintiff argues BCBSOK's alleged bad faith constitutes a "continuing tort" and because BCBSOK continued its misconduct up until shortly before the time of suit, her bad faith claim is timely. Suffice to say this case is about a singular injury arising out of one insurance claim. This most assuredly is not a case of a continuing tort.

that a plaintiff need not have conclusive evidence of the cause of an injury in order to trigger the statute of limitations. "Rather, we focus on whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm. In this context, a plaintiff must use reasonable diligence in seeking to discover facts giving rise to a claim for relief." *Alexander v. Oklahoma*, 382 F.3d 1206, 1216 (10th Cir. 2004). Because Plaintiff's bad faith claim accrued no later than February 2016, the Oklahoma two-year statute of limitations bars such claim.

\* \* \*

For all the foregoing reasons, the judgment of the district court is AFFIRMED.

Entered for the Court


Bobby R. Baldock
United States Circuit Judge

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

| | |
|---|---|
| Christopher M. Wolpert<br>Clerk of Court | Jane K. Castro<br>Chief Deputy Clerk |

October 27, 2023

Mr. Ryan Howard Olsen
Mr. Michael T. Torrone
Logan & Lowry
101 South Wilson Street
P.O. Box 558
Vinita, OK 74301-0558

Mr. Edward Leslie White
Edward L. White
829 East 33rd Street
Edmond, OK 73013

**RE:** **21-6141, Terry v. Health Care Service Corporation**
Dist/Ag docket: 5:18-CV-00415-PRW

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R.35 and 40 for further information governing petitions for rehearing.

2

Please contact this office if you have questions.

                                              Sincerely,

                                              Christopher M. Wolpert
                                              Clerk of Court

cc:      Tacy F. Flint
          Brian P. Kavanaugh
          Brian W. Tobin

CMW/art